**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ETEAM INC., <br><br> Plaintiff, <br><br> v. <br><br> SVS TECHNOLOGIES LTD., <br><br> Defendant. | Civil Action No. 19-18600 (SDW) (LDW) <br><br> **OPINION** <br><br><br> June 16, 2021 |

**WIGENTON**, District Judge.

Before this Court is Plaintiff eTeam Inc.'s ("Plaintiff") Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1332(a)(1) and 1332(a)(2). Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff is a New Jersey corporation that assists companies with staffing their technology needs. (D.E. 1 ("Compl.") ¶¶ 1, 7); About Us (last accessed May 23, 2021), https://www.eteaminc.com/. On April 8, 2013, Plaintiff and Defendant entered into a Consulting Services Agreement ("CSA"). (Compl. ¶ 8; Compl., Ex. A.) Article 6 of the CSA contained an indemnity clause, stating that Defendant "shall indemnify and hold the CLIENT[1] … harmless for

---

[1] The CSA defines "CLIENT" as "eTeam Inc." and "VENDOR" as "SVS Technologies Ltd." (Compl., Ex. A.)

any … claims brought or liabilities imposed against the CLIENT ... by VENDOR['s] Consultant(s) or any third party … whether relating to VENDOR['s] Consultant(s) working visa status or any other matters involving the acts or omissions of VENDOR and its employees." (Compl., Ex. A; D.E. 36-2, ¶ 3.) Plaintiff's clients included Infosys Limited ("Infosys") and Pontoon Solutions Inc. ("Pontoon"). (D.E. 39-1 ("Br.") at 3; D.E. 44, ¶¶ 6, 7, 9.) Pursuant to the CSA, a separate purchase order, and various staffing supplier agreements, Plaintiff provided employees, including Defendant's employee Sandhya Fnu, to Pontoon and Infosys, who subsequently used Ms. Fnu's services to support their client Northwestern Mutual ("Northwestern"). (Br. at 3-4; *see* D.E. 44, ¶¶ 16, 18.) According to the CSA, Ms. Fnu remained Defendant's employee throughout her work with Northwestern. (Br. at 5; D.E. 44, ¶¶ 6, 18.)

Ms. Fnu performed work for Northwestern from "June 27, 2018 until [] August 14, 2018," (D.E. 42 at 17), during which time she had access to Northwestern's confidential and proprietary information. (Compl. ¶ 15; D.E. 39-9, McGuire Cert., Ex. D at ¶ 6.) Northwestern later alleged that Ms. Fnu shared that confidential information with unauthorized third parties, which required Northwestern to investigate the incident and remediate the damages. (Compl. ¶¶ 16–18; D.E. 39-10, Ex. I; D.E. 44, ¶ 16.) On August 9, 2018, after meeting with Northwestern staff, Ms. Fnu executed an affidavit (the "Northwestern Affidavit"), in which she acknowledged that she had (1) access to "confidential and proprietary" information in her role with Northwestern; (2) used "LinkedIn messaging" to send her fiancé a confidential Northwestern spreadsheet; and (3) was hired at Northwestern based on falsified qualifications that did "not accurately reflect [her] background, education, experience [or] skills." (Br. at 20–21; D.E. 36-5, McGuire Cert., Ex. D, ¶¶ 3, 4, 6–8; D.E. 44, ¶ 18; *but see* D.E. 42, Fnu Cert. (Ms. Fnu alleging that she was intimidated into signing the Northwestern Affidavit).)

In December 2018, relying in part on the Northwestern Affidavit, Northwestern sent a demand letter to Infosys alleging that it had sustained damages due to fraudulent vendors and employees' actions that compromised confidential information. (Br. at 5–6; D.E. 44, ¶¶ 20–21.) To satisfy Northwestern's demands, Infosys "made [a] February 8, 2019 demand for indemnity upon Pontoon," (Br. at 6), and, in turn, Pontoon made an April 16, 2019 indemnification demand on Plaintiff, (*id.* at 7; D.E. 44, ¶ 23). At this point, Plaintiff made its indemnification demand on Defendant. (*Id*. ¶ 24.)

Over the next few months, Plaintiff negotiated with Pontoon and Infosys about the indemnification demand. (Br. at 7; *see* D.E. 36-2, ¶¶ 26, 32-36; D.E. 44 ¶¶ 26, 32–36.) Although Defendant asserts that it was not asked to join these settlement negotiations, (D.E. 43-1 ¶¶ 60, 69; D.E. 44, ¶ 25), and that it was working to retain counsel, (D.E. 41, ¶¶ 26-28, 30-31, 33), email records suggest that, over at least "five months," Defendant made no material attempts to join the settlement negotiations (*see* Br. at 8–13; D.E. 36-2, ¶ 25; D.E. 39-12, Ex. M; D.E. 44, ¶¶ 39, 40.). Ultimately, in part due to the existence of the Northwestern Affidavit, (*see* D.E. 44, ¶ 44), Plaintiff, Pontoon, and Infosys resolved their claims in a settlement agreement dated September 12, 2019 (the "Settlement"), (Br. at 7–8, 24). Of the final Settlement payment, $180,000 was attributed to Ms. Fnu's conduct. (Br. at 12, 16; D.E. 45, ¶¶ 62-63.)

On October 2, 2019, Plaintiff filed the instant Complaint against Defendant. (Compl.) Defendant answered on January 26, 2020. (D.E. 4.) On February 19, 2021, Plaintiff filed this Motion for Summary Judgment. (D.E. 36; D.E. 39.) Defendant opposed on March 22, 2021. (D.E. 43.) On April 11, 2021, Plaintiff replied. (D.E. 53.)

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions, or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quotation omitted).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d

4

584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

## II.   DISCUSSION

### A.  Settlement Indemnification

In New Jersey, "[a] party may be indemnified for settlement payments it makes provided that the following three criteria are met: '(a) the indemnitee's claims are based on a valid, pre-existing indemnitor/indemnitee relationship; (b) the indemnitee faced potential liability for the claims underlying the settlement; and (c) the settlement amount was reasonable.'" *Serpa v. New Jersey Transit*, 951 A.2d 208, 213 (N.J. Super. Ct. App. Div. 2008) (quoting *Chem. Bank of N.J. Nat'l Ass'n v. Bailey*, 687 A.2d 316, 320–21 (N.J. Super. Ct. App. Div. 1997)). Here, these three requirements are satisfied, and Plaintiff is entitled to summary judgment as to the Settlement total.

First, it is undisputed that Plaintiff's indemnification claim is based on a valid, pre-existing indemnitor/indemnitee relationship.[2] (*See* Compl., Ex. A.) Second, the record clearly demonstrates that Ms. Fnu's actions exposed Plaintiff to "potential liability" for the underlying Settlement claims from Pontoon and Infosys. (*See* Br. at 21–22; D.E. 36-2, ¶ 17; D.E. 39-9, McGuire Cert., Ex. F (Infosys threatening Plaintiff with the "formal legal process"); D.E. 39-10, McGuire Cert., Ex. I ("We are hereby setting forth in writing our demand that Infosys reimburse Northwestern Mutual in the amount of $1,300,000 for actual damages Northwestern Mutual has suffered as a result of Infosys's supplying to us subcontracted employees who were either not qualified and/or who were contracted under false pretenses."); D.E. 44, ¶¶ 17 ("SVS does not dispute that [Northwestern] complained to Infosys regarding subcontracted employees …"), 20.) Even if this Court were to accept Defendant's largely unsupported argument that Northwestern coerced Ms. Fnu into executing the Northwestern Affidavit, (*see* D.E. 43 at 11), this would not have eliminated Plaintiff's potential litigation exposure,[3] (*see* Br. at 21–22; D.E. 53 at 1-2 (noting that Defendant has failed to dispute the Northwestern Affidavit's content regarding SVS and Ms. Fnu's conduct, but merely the context of its execution), 7). Thus, the first and second criteria for settlement indemnification are met.

Turning to the third prong, if Plaintiff's settlement was reasonable, the CSA's indemnification clause requires Defendant to indemnify Plaintiff for Infosys and Pontoon's claims. *See Serpa*, 951 A.2d 208 at 213. "[R]easonableness and good faith require that the [party] expend

---

[2] Defendant does not rely on the CSA's language or make any arguments, aside from those related to attorneys' fees, that specifically reference CSA Article 6. (*See generally* D.E. 43 at 1–25.)

[3] Defendant seems to misconstrue the concept of *potential* liability, which is not "eradicated" by available defenses (especially seemingly weak ones), with an assessment of whether those available defenses would ultimately prevail at trial. (*See*, *e.g.*, D.E. 43 at 12.) Thus, to the extent that Defendant relies on its available defenses to refute prong two, this Court has considered and rejected those arguments. (*See id.* at 8–9 (making arguments related to prong three's "reasonableness" element under a heading related to prong two's "potential liability" element).)

efforts to determine whether the claims are valid and whether the amount proposed is reflective of the injuries claims." *Hartford Cas. Ins. Co. v. Peerless Ins. Co.*, Civ. No. 10-6235, 2019 WL 4746339 at *25 (D.N.J. 2019) (quotation omitted).  Here, given the information available to Plaintiff during the Settlement negotiations, there is no question that Plaintiff acted reasonably and conducted good faith investigations into the proposed settlement amount.

An issue of fact is "'genuine' if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor." *Armano v. Martin*, 157 F. Supp. 3d 392, 400 (D.N.J. 2016), *aff'd*, 703 F. App'x 111 (3d Cir. 2017) (citation omitted).  Defendant, however, does not provide any evidence that Northwestern's "invoices" or "legal fees" were, in fact, unhinged from the Settlement total. (*See generally* D.E. 43.)  Defendant does not cite to deposition testimony regarding the costs or scope of the investigation, admit or deny that the specific documents attached to the Northwestern Affidavit were those that Ms. Fnu shared, or provide market estimates for the cost of a similar data breach investigation. (*Id*.)  Instead, Defendant cites to Defendant's CEO, Mr. Chitti, and Ms. Fnu's certifications, which provide largely explanations for Ms. Fnu's behavior that were seemingly never entirely provided to Plaintiff during the negotiations themselves. (*Id*.; D.E. 41, D.E. 42.)  Such ex post facto justifications are insufficient to create an issue of material fact at this stage of litigation.

In real-time, Plaintiff had access to the Northwestern Affidavit, which was originally attached to computer documents that Northwestern claimed were confidential. (Br. at 6-16; D.E. 35-2, ¶ 2; D.E. 39-9, McGuire Cert., Ex. D ¶ 7 ("The Northwestern Mutual spreadsheet contained field compensation information" and "identities" of Northwestern Mutual Agents that were "concealed using a code").)  As to the total settlement amount, Plaintiff had been told during negotiations that, although investigating Ms. Fnu's breaches had been costly, Northwestern

7

intended "only to recover the hard costs" it suffered "due to Infosys's breach of contract in supplying Northwestern Mutual the sub-contracted employees at issue." (*See* Br. at 23.) Further, Defendant's allegations that Plaintiff "simply accepted" Infosys's settlement demands, (*see* D.E. 43 at 23), are undermined by the fact that Plaintiff negotiated the Settlement down from its peak price by 25%, (*see* Br. at 24). Thus, Plaintiff has carried its evidentiary burden that it reasonably concluded that Pontoon and Infosys's indemnification claims were reflective of Northwestern's actual injuries.[4] (*Compare* D.E. 53 at 6–10 (discussing the information at Plaintiff's disposal regarding Northwestern's alleged damages) *with* D.E. 43.)

For similar reasons, although Defendant continues to insist that it provided Plaintiff with plausible defenses that Ms. Fnu was "coerced" into signing the Northwestern Affidavit and that the uploaded information was not "confidential," these defenses do not create a genuine issue of material fact regarding the Settlement's reasonableness. To support these defenses, Defendant only relies on Mr. Chitti and Ms. Fnu's certifications. (D.E. 41, D.E. 42, D.E. 43 at 9–10.) Further, Defendant fails to present this Court with testimony or discovery from, for example, Northwestern, Infosys, or Pontoon that could clarify the context of the Northwestern Affidavit's execution, the nature of the allegedly confidential documents, or the facts regarding Ms. Fnu's allegedly forged credentials and interview. (*See* D.E. 43.)

Finally, the email evidence in the record suggests that, notwithstanding Mr. Chitti's statements to the contrary, Defendant was repeatedly and clearly advised of the settlement, its sticking points, and his opportunities to engage in negotiations. (*See* D.E. 36 at 24–25; D.E. 50 at

---

[4] Setting aside the circumstances under which the Northwestern Affidavit was signed, neither Defendant's briefing nor Mr. Chitti and Ms. Fnu's certifications specifically dispute the truthfulness of the document's content or the underlying wrongdoing it asserts occurred during Ms. Fnu's hiring. (*See generally* D.E. 41; D.E. 42; D.E. 43; D.E. 44.) Defendant also fails to provide specific descriptions of Ms. Fnu's Linkedin messages, and instead only vaguely describes them as "coding queries" without clarifying those queries' content or attachments. (*See* D.E. 43 at 15.) Nor does Defendant engage with Plaintiff's arguments that it lacked subpoena power during the Settlement negotiations. (*Id*. at 13.)

13; D.E. 56 at 7 (asserting that Plaintiff had "asked Mr. Chitti … if [Defendant] wanted to take over the negotiations"), 8; *but see* D.E. 41 at 6 (asserting that Mr. Chitti was never asked to "participate in any of the settlement discussion"), 17.) Further, Defendant had the opportunity to act quickly to engage counsel given the progression of Settlement discussions. (*See* D.E. 41 at 13–15 (noting that Mr. Chitti was still "retain[ing] an attorney" in September 2019, although he had been made aware of Ms. Fnu's actions in May 2019).) In fact, even accepting Defendant's arguments that its defenses were not adequately represented, and the belated assertions that have surfaced regarding Ms. Fnu's alleged intimidation, a reasonable party would have been incentivized to secure counsel as quickly as possible. Defendant, however, failed to do so.

Thus, even drawing all justifiable inferences based on Mr. Chitti and Ms. Fnu's certifications in Defendant's favor, this Court cannot conclude that, at the time of the Settlement, Plaintiff acted unreasonably in accepting the Northwestern Affidavit as a genuine liability and assessing Northwestern's damages claims as legitimate. *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019) ("Unsupported allegations, subjective beliefs, or argument alone ... cannot forestall summary judgment."). In sum, Defendant has failed to "identify specific facts and affirmative evidence that contradict those offered by" Plaintiff. *Armano*, 157 F. Supp. 3d at 400. Even if the Court took Defendant's unsupported factual assertions as true, they do not suggest that Plaintiff's actions in regularly corresponding with Defendant regarding negotiations and, ultimately, settling the matter were unreasonable.

### B. Attorneys' Fees

Although Plaintiff is entitled to Settlement indemnification, the CSA's indemnification provision does not clearly provide for attorneys' fees. Contract provisions are "strictly construed in light of the general policy disfavoring counsel fee awards." *See Verizon New Jersey, Inc. v.*

*One Washington Park Urb. Renewal Ass'n*, Civ. No. 1507-08T2, 2010 WL 2010794, at *16 (N.J. Super. Ct. App. Div. May 18, 2010). Here, the CSA's indemnification language does not expressly discuss attorneys' fees. *See Days Inn Worldwide, Inc. v. BFC Mgmt., Inc.*, 544 F. Supp. 2d 401, 408 (D.N.J. 2008) (concluding that the indemnification provision did not allow for attorneys' fees, where "the hold harmless provision … provide[d] for indemnification for 'any and all debts, liabilities, claims and obligations of the Corporation,'" but did not " explicitly state that attorneys' fees [we]re included in such indemnification"). Further, Plaintiff has not presented compelling evidence that Defendant acted in "bad faith, vexatiously, wantonly, or for oppressive reasons" during this litigation's pendency, regardless of Ms. Fnu and Defendant's underlying actions. *See Hall v. Cole*, 412 U.S. 1, 4-5 (1973). Finally, as Defendant points out, when the parties intended to "include attorneys' fees" in the CSA, they were capable of doing so unambiguously. (*See* D.E. 43 at 28 n.3; Compl., Ex. A, Art. 6.3.) In sum, Plaintiff's request for attorneys' fees is denied.

### III. CONCLUSION

For the reasons set forth above, Plaintiff's motion is **GRANTED** in part and **DENIED** in part. An appropriate order follows.

                                              /s/ Susan D. Wigenton  
                                      **SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk  
cc: Parties  
      Leda D. Wettre, U.S.M.J.